**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SOUTH ALLEGHENY PITTSBURGH RESTAURANT ENTERPRISES, LLC,<br><br>Plaintiff,<br><br>       v.<br><br>CITY OF PITTSBURGH, CITY OF PITTSBURGH DEPARTMENT OF PERMITS, LICENSES AND INSPECTIONS, AND MARK MARIANI,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 16-1393<br>)    Judge Nora Barry Fischer |

## MEMORANDUM OPINION

I.       INTRODUCTION

This is a § 1983 action related to the City of Pittsburgh Department of Permits, Licenses and Inspections' ("PLI") issuance of a "Stop Work Order / Cease Operations" notice ("Order") to Plaintiff South Allegheny Pittsburgh Restaurant Enterprises, LLC ("Plaintiff") at its East Carson Street establishment Mother Fletcher's at approximately 12:30 a.m. on September 4, 2016. (Docket No. 1).   Mother Fletcher's "Southside Party Joint" was billed by its proprietor as "the biggest and most out-of-control Under-21 party on this side of the United States," but was shut down by PLI at the conclusion of its grand opening because it was not operating as a restaurant as permitted under the City's Zoning Code—offering only a "chip buffet" and "soft drink bar" to its patrons.   Presently before the Court is a Motion for Temporary Restraining Order/Preliminary Injunction that is opposed by Defendants, the City of Pittsburgh, (the "City") and PLI.[1] (Docket

---

[1]      The Court notes that Defendant Mark Mariani has not been formally served with process at this point, although he did appear at the proceedings and testified as a witness for his codefendants.

1

Nos. 2, 3). The Court held a motion hearing on September 12, 2016 and oral argument on September 13, 2016.[2] (Docket No. 16). The parties then submitted supplemental briefs on September 14, 2016. (Docket Nos. 19, 20). After careful consideration of the parties' arguments and the evidence of record, and for the following reasons, Plaintiff's Motion [2] is denied.

## II. FACTUAL BACKGROUND[3]

At the September 12, 2016 hearing, the Court accepted testimony from: Brandon Firman, President and owner of Plaintiff; Corey Layman, Zoning Administrator, PLI; City of Pittsburgh Councilman Bruce Kraus, Third Council District; City of Pittsburgh Bureau of Police Detective Brian Radocaj; Mark Mariani, Assistant Director of Operations, PLI; and, Maura Kennedy, Director of PLI. (Docket No. 16). The Court found all of the witnesses to be generally credible and truthful throughout their respective testimonies, with the exception that the repeated assertion by Firman and his counsel that Mother Fletcher's was operating as a restaurant was not established as a matter of law under the applicable definition of same under the City's Zoning Code. Numerous exhibits were also introduced into evidence. (*See* Pl. Exs. 1-4; Def. Exs. B-G, H).

The property in question at 2200 East Carson Street is located in a local neighborhood commercial business district on the City's South Side, on the corner of South 22nd Street and East Carson Street. (*See* Def. Ex. B). As the Court commented at the hearing, it is well known that the South Side is a "happening place," with numerous bars and restaurants located along East Carson Street, and attracts large crowds of partiers on weekend evenings/early mornings.

---

[2] The official transcripts of the proceedings have not been prepared at this time as the parties did not request an expedited production of the transcripts. As such, the Court is unable to cite to same and relies upon its notes of the witness testimony and a rough draft of the transcripts.

[3] "A court considering whether to grant a preliminary injunction may assess the credibility of witnesses testifying before it at a preliminary injunction hearing, and base its decisions on credibility determinations." *One Three Five, Inc. v. City of Pittsburgh, et al.*, 951 F. Supp. 2d 788, n.2 (W.D. Pa. Jun. 17, 2013) (quoting *Hudson Global Resources Holdings, Inc. v. Hill*, Civ. A. No. 07-132, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007)).

Councilman Kraus estimated that the area of East Carson Street stretching from Station Square to the South Side Works has a total occupancy of approximately 20,000 people (all of whom could be alcohol consumers). Detective Radojac confirmed that the South Side crowds are larger on nights when there is a big game in town, such as the Pitt-Penn State game of September 10, 2016. Naturally, disbursement of these establishments at closing time of 2:00 a.m. involves significant City resources including police, emergency medical and firefighters.

Councilman Kraus has fielded numerous complaints from constituents concerning bars and nightclubs operating on the South Side and regarding unruly behavior of individuals partaking in same. He has brought these types of concerns to Layman, a zoning administrator, on many occasions. The typical South Side weekend crowd results in numerous reports of criminal incidents occurring in the area, as was demonstrated through Detective Radocaj's testimony, during which he summarized the dispatch calls that the police department was required to respond to within the past six weeks in a 2-3 block radius around 2200 East Carson Street. Among these reported incidents included a fight, theft, an armed robbery, public intoxications, arrests for driving under the influence, and traffic violations. (*See* Def. Ex. I). PLI and the Pittsburgh Bureau of Police have engaged in compliance checks of many bars on the South Side. In this regard, Assistant Director Mariani explained that in the recent past, these types of compliance checks were routinely conducted on weekend evenings to ensure compliance with the City's Construction and Zoning Codes.

The property in question at 2200 East Carson Street is owned by the Kahlil family and has been for many years. (Def. Ex. B). The prior occupant of the property, Margaritaville, was deemed a nuisance bar and shut down by the City after a compliance check that was conducted

more than 3 years ago.[4]   Assistant Director Mariani was present on that occasion and explained that more than 50 officers were involved.

The Certificate of Occupancy for the property, issued on October 21, 1986, expressly states that the permitted occupancy of the property includes a "First floor restaurant (see B.A. #425 of 1984)."   (Def. Ex. B).   The reference to B.A. #425 of 1984 is to a decision by the Zoning Board of Adjustment dated November 21, 1984, wherein the Zoning Board held that the property was granted a special exemption to operate a first floor restaurant and bar with a condition that there be "no live entertainment involved in the business."   (Def. Ex. B).   Layman provided uncontested testimony that the exception granted in 1984 and limitations therein "run with the land" and remain in effect.   He also explained that his review of the zoning file for the property indicates that no other changes to the zoning of the property have occurred since that decision was rendered over 20 years ago.   Layman further testified that the lot size of the property was less than 2,400 square feet, making the area of the first floor of the building even less than that figure.

The City's comprehensive Zoning Code regulates the use of property in each designated zoning district.   Under the Zoning Code, "[u]se means the purpose for which land or a building is arranged, designed or intended, or for which either land or a building is or may be occupied or maintained."   *City of Pittsburgh Zoning Code ("Zoning Code")* at § 926.242.   Further, "[p]rimary [u]se means the principal or predominant use of any lot or parcel." *Id.* at §926.184. Per Layman, the Zoning Code contains an extensive list of uses.   Relevant here, "restaurant" and a few iterations thereof are specifically defined in the Zoning Code, as follows:

> Restaurant means an establishment other than "Fast-Food Restaurant" where the principal business is the sale of food in a ready to consume state, where there is no service to a customer in an

---

[4]        The Court notes that neither Firman nor his family members had any association with Margaritaville.

automobile, and where the design or principal methods of operation consist of one (1) or more of the following:

1. A sit-down restaurant where customers are normally provided with an individual menu, are generally served food in non-disposable containers by a restaurant employee at the same table or counter at which the food and beverage items are consumed or

2. A cafeteria or cafeteria-type operation where food and beverage generally are served in non-disposable containers and are consumed within the restaurant;

But not including Social Club.
…
Restaurant (Limited) means a Restaurant with a gross floor area of less than 2,400 square feet and that does not have live entertainment or dancing.
…
Restaurant (General) means a Restaurant with a gross floor area of 2,400 square feet or more or one that has live entertainment or dancing.

*Zoning Code* at § 911.02 "Use Table" (Ord. 23/November 23, 2005). In a local neighborhood commercial district such as the South Side, a use within the definition of "Restaurant (Limited)," is "permitted by right." *Id.* This means that a business can operate as a restaurant with "a gross floor area of less than 2,400 square feet and that does not have live entertainment or dancing" without first seeking zoning approval from the Zoning Board of Adjustment. *Id.* However, the Zoning Code provides that a "Restaurant (General)" requires a "special exemption" prior to running a restaurant "with a gross floor area of 2,400 square feet or more or one that has live entertainment or dancing."[5] *Zoning Code* at § 911.02. To this end, the Zoning Code states that a "Restaurant (General)" use "shall be allowed in the respective district only if reviewed and approved by the Zoning Board of Adjustment in accordance with the Special Exception review procedures of Sec.

---

[5] Zoning Administrator Layman testified consistently with this regulation, advising the Court that a restaurant general requires a special exemption from the Zoning Board of Adjustment.

922.07." *Zoning Code* at § 911.01.D. The Zoning Code provides detailed procedures for a property owner or his/her agent to obtain a variance, special exemption, or conditional use for a particular property. *See e.g.*, *id.* at §§ 922.06, 922.07, 922.09. These provisions all generally require an application to be filed with the Zoning Board of Adjustment, provide an opportunity for a hearing, and set forth procedures whereby a property owner (and others) may appeal an adverse decision. *See id.* Plaintiff admits that neither Mother Fletcher's nor its operator Firman took any of these actions prior to its grand opening on September 3, 2016.

With that said, Firman did take several significant steps prior to opening Mother Fletcher's. By way of background, Firman is a high school graduate who completed some college courses at CCAC although he did not earn a degree. He has worked as a DJ for other under-21 clubs in the area, including Club Zoo in the Strip District which is owned by his father. He also has an uncle and cousin in the club business.[6] Firman incorporated his business; he named it South Allegheny Restaurant Enterprises, LLC, although he lives in the east suburbs and attended Fox Chapel High School in the North Hills. Firman leased the property from Kahlil Real Estate for approximately $3,500.00 per month and testified that he owed $7,000.00 (or two months' rent) as of the date of the hearing.

Over the past few months, Firman invested time and money to transform the former Margaritaville space into Mother Fletcher's Under-21 dance club. At the hearing, he drew the layout of the space, describing how he tore down the prior bar and rehabilitated the property, which is separated into two distinct rooms. (*See* Pl. Ex. 4). In the first room, depicted on the left of his drawing, Firman installed a cashier window, a "soft drink bar," and set up three high tables

---

[6]    As is explained below, Firman is also represented in this lawsuit by another uncle, Irving Firman, Esquire, a partner at Tucker Arensberg, P.C. who previously worked for the City of Pittsburgh Housing Authority and as a solicitor in Upper Saint Clair Township. Irving Firman did not attend the hearing or oral argument.

surrounded by chairs for his patrons near the back of the room. (*Id.*). The second room located on the right side of the drawing was formerly the barroom area of Margaritaville. It now consists mostly of a dance floor but also has a DJ booth and VIP area. (*Id.*). Firman testified that he installed expensive lighting and a sound system in this area; he also placed signage on the windows in order to block the emissions from the lighting systems from leaving the building and distracting drivers on East Carson Street. (*Id.*). There is a kitchen area located directly behind the second room containing the dance floor. (*Id.*). Firman admitted that he had not renovated the kitchen area, that it was being used as storage and that he had not used the appliances that the owners of Margaritaville had left behind.

Prior to its grand opening, Mother Fletcher's "Southside Party Joint" advertised heavily in print and online advertisements, including on social media. The grand opening was set for Saturday, September 3, 2016. Mother Fletcher's planned to be open thereafter on Friday and Saturday nights from 9:00 p.m. to 1:00 a.m. The "about" page on Mother Fletcher's website states that:

> **Mother Fletcher's** | A concept from the West Coast, has officially made its way to Pittsburgh. The Under-21 party life will never be the same; consider the game **changed**. The biggest crowds, incredible lighting & visual effects, the most high-end sound system, and the best mix of Hip-Hop, Top-40 and custom remixes in the Tri-State! The Under-21 party has **returned** to Pittsburgh, and the bangers have never been crazier!
>
> Each and every Saturday night, join the **huge** crowd at Mother Fletcher's for the biggest and most out-of-control **Under-21** party on this side of the United States! **Each and every Friday & Saturday Night**, the most **incredible** young adult dance club is right around the corner at 2200 E. Carson St. | Southside!

(Def. Ex. E (emphases in original)). Other aspects of the advertising indicate that Mother Fletcher's had the "biggest parties" and "wildest partiers" around. (Def. Exs. C-E). The

"events" page promoted numerous events that Mother Flectcher's planned to host between September 9 and October 1, 2016, including, among other things, a Beach Party with "bikinis recommended" for "ladies." (Def. Ex. F). Firman claimed that his advertisements contained significant "puffery" to try to increase his business and youthful "slang" geared toward his teenage clientele, but conceded that none of his advertisements mentioned the sale of food and that there was no minimum age limit mentioned throughout. During his testimony, Firman explained that he had set an age minimum for patrons of 15 years old and did not permit anyone 21 years or older into his establishment.

Firman obtained construction permits and an occupancy load placard, which he understood limited the maximum number of persons allowed in Mother Flectcher's at any time to 173. (*See* Docket No. 1-2). Between July 14, 2016 and September 3, 2016, the location was visited several times by representatives of PLI including Bill Kelly, Kurt Eisman and Chris Wheelock. Firman testified that the construction plans he submitted as part of the permitting process contained an architectural rendering of the space, on which the second room was clearly marked as a "dance floor." Yet, he admitted that he did not provide anyone at the City or PLI with copies of his advertising, adding that they never asked for same. Firman also stated that Allegheny County health inspectors issued him an approval sticker that was affixed to one of the windows of the property. (*See* Pl. Ex. 2).

The City's witnesses generally confirmed that representatives of PLI had approved Firman's applications for construction permits and the occupancy load placard. Director Kennedy explained that PLI issues around 13,000 permits annually. She testified that PLI is generally split into three divisions: issuance and inspection of construction permits; business licenses; and maintenance of existing structures and businesses. She added that the approvals that

Firman had obtained and the representatives of PLI that he had met with were from the construction division and not the business licensing division which handles zoning matters. Hence, the construction permits and occupancy load placard that Firman had obtained did not alter the scope of the use permitted on the property under the Zoning Code. The City's witnesses advised that there was little communication between the divisions tasked with the separate functions to issue the construction and business permits, although Director Kennedy acknowledged that she was aware that the occupancy placard had been approved and has been involved in the zoning dispute as well.

The evidence presented at the hearing demonstrated that City and PLI representatives became aware of the nature of Plaintiff's business as an under-21 dance club prior to the grand opening. Councilman Kraus testified that, after being told by a constituent that a new business was opening in the Margaritaville space, he alerted Layman and asked him to investigate the type of use that was permitted on the property under the Zoning Code. Layman did so and advised him that the property was zoned for use as a restaurant and bar. Councilman Kraus and Director Kennedy met in person on Friday, September 2, 2016 and discussed the matter over the phone.[7] Councilman Kraus had learned of the Facebook advertising for Mother Fletcher's, reviewed same and had concerns about the establishment which he shared with Director Kennedy. He was concerned about the fact that the windows were blocked, the nature of the advertising, the apparent targeting of minors without a minimum age listed, the lack of any mention of food and the prospect of introducing potentially vulnerable underage individuals to the South Side scene in the early

---

[7]     Several of Defendants' witnesses testified that there was email correspondence related to the operations at 2200 East Carson Street that has yet to be produced given the infancy of this lawsuit.

morning hours around when the bars close.[8]   Director Kennedy reviewed the advertising herself

and shared those concerns.   She also expressed unease that the business advertised for minor girls

to dress in bikinis for a beach party.

After reviewing the advertisements and speaking with Councilman Kraus, Director

Kennedy believed that Mother Fletcher's was planning to operate outside of the permitted use of

the property in a manner that she described as an "illegal nightclub." She decided to conduct a

compliance check on the evening of September 4, 2016.   That morning, she contacted Assistant

Director Mariani and the Sergeant in charge of Zone 3 for the Bureau of Police.   Director

Kennedy requested that Mariani conduct a compliance check at the establishment to make sure

they were operating in accordance with the approved use.   When she spoke to the Police Sergeant,

her impression was that law enforcement was already aware of the advertising by Mother

Fletcher's.   Director Kennedy had no input into the number of officers that were utilized to staff

the compliance check.   No one from the City alerted Firman or anyone else associated with

Mother Fletcher's of the forthcoming compliance check.

Mother Fletcher's opened its doors at 9:00 p.m. on September 4, 2016.   Firman staffed the

business with around 11 individuals.   He, along with two individuals he described as "security

guys," worked the door that evening, checking identifications and enforcing his unwritten age

policies.   A few other staff members were located within the building.   He also hired a DJ to

"spin" in the second room.   This individual took videos of the evening and published them on the

internet. While Firman did not authorize the DJ to do so he had no problem with it as the video was

---

[8]     Councilman Kraus also articulated other concerns with the establishment that are not directly relevant here. To this end, he explained that the South Side is a "historically designated district" due to the Victorian architecture of the buildings throughout the East Carson Street corridor which requires business owners to obtain permits prior to making changes to the façade of the buildings in the area.   He believed that Mother Fletcher's painted the outside of the building without obtaining the necessary permits.

promoting his business.

Firman claimed repeatedly that Mother Fletcher's was operating as a restaurant. He explained that all of the patrons were charged a $20 cover which entitled them to a bag of chips from what he described as a "chip buffet." Firman added that he had a standing rack containing individual bags of chips near the entrance and the wait staff would open an individual bag and put the chips on a plate for each individual patron upon their entry. He did not monitor if everyone took the chips or if they ate them. There were also soft drinks available for sale at the "soft drink bar." Firman asserted that he had a menu but did not produce one at the hearing. He also said that he had pretzels and poptarts that were available for sale but that they were under the "soft drink bar" and out of view of the customers.

Firman estimated that he had a total of 70 patrons throughout the night and that the highest number of individuals in the establishment at any one time was 40, well below the maximum capacity of 173. All of the patrons had exited the business as of 12:30 a.m. He observed no fights, underage drinking or any other issues with the patrons. He told the Court upon questioning that the gross sales for the evening were $1,230.00 and the business had a net profit of $40.00. However, he did not maintain receipts of any of the products that he had purchased for sale from Restaurant Depo in the Strip District or produce any other financial records.

At around 12:15 a.m., Sergeant Eric Baker and Assistant Director Mariani arrived on East Carson Street in a marked police cruiser, parked across the street from Mother Fletcher's and observed the area. Mariani testified that the front door of the establishment was open and that he saw five to seven young people going in and out of the business. After a few minutes, they left their position on East Carson Street and drove to meet up with other officers who were assembling near 18th Street, where the Court understands the Zone 3 police station is located. Three other

officers entered the car with Sergeant Baker and Mariani and 3 or 4 other patrol cars filled with police provided additional support. This group then drove to the scene at 2200 East Carson. Two cars parked on East Carson Street and the others stopped on 22nd Street. Several of the officers exited their vehicles and entered Mother Fletcher's to clear the space. The door remained open at this time and Firman testified that he let them in without objecting. At that point in time, all of the patrons had left. Firman testified that he believed that there were 28 officers in the establishment, although he could have counted a few officers twice; Mariani said that he did not count the number of officers.

Mariani remained in the car initially but the officers quickly returned and advised him that the place was clear and that he could enter. He testified that it was standard protocol in these types of compliance checks for the police to enter first to ensure that it was safe for him to enter. Mariani then entered Mother Fletcher's and walked around to inspect the premises. He observed the operation, including the chip rack, "soft drink bar" and the kitchen area being utilized as a storage area, and had a brief discussion with Firman, as they both confirmed. He said that he asked Firman for a menu but that he could not produce one; Firman denied that he was asked for a menu. With that said, both generally agreed that Mariani told Firman that he was not operating a traditional restaurant like an Eat N Park and that he was shutting down the business. They also concurred that Firman attempted to explain how the business was operating as a restaurant and Mariani told him to take it up with the City on Tuesday, as it was Labor Day weekend. On cross, Mariani admitted that he did not know the full definition of "restaurant" under the Zoning Code.

At some point, Mariani returned to the police car, filled out three "Stop Work Order / Cease Operations" forms and posted them on all of the building's doors, making them visible to anyone passing by on East Carson Street. The notice states that 2200 E. Carson Street "is in violation of"

the "Zoning Code – Title 9" because the "work /operations [was] not in compliance with the approved permit or license." (Pl. Ex. 1). The "corrective action needed to remove this condition" is to "obtain required approvals, permits and/or licenses." (*Id.*). The notice continues that "[t]he Department of Permits, Licenses, and Inspections has ordered that all work / operations cease at this premise. Continued work / operations, or removal or damage to this notice, is illegal. Penalties will be assessed when work / operations have commenced before first obtaining the required permit or license." (*Id.*). Mariani signed as Inspector and provided his phone number on the form. (*Id.*). The address, website, phone number and fax number for PLI is also included on the bottom of the form. (*Id.*).

Nothing else occurred with respect to this matter for the remainder of Sunday, September 4, 2016 or the following day, Monday, September 5, 2016, as it was Labor Day and City Offices were closed. On Tuesday morning, Mariani received a voice mail at around 11:00 a.m. from individuals who advised that they were legal representatives for Plaintiff. An attorney also dropped off a business card at his office later in the day with a note requesting a return call. Mariani did not return these contacts; rather, he referred the matter to the law department as attorneys were now involved and he does not get involved with legal matters. He also did not send a notice of violation to the business due to this referral.

Independently, Firman's uncle, attorney Irving Firman, contacted Director Kennedy on Tuesday, September 6, 2016. Director Kennedy testified that attorney Firman asked about how the order could be lifted or the business could move forward. She credibly explained that she told him the business had three options: (1) appeal the notice to the Zoning Board of Adjustment; (2) cease operations and operate within the approved use of the property; or (3) take the path to legalize the desired use. Director Kennedy then advised attorney Firman where to find the appeal

form on the website and he responded that they would file an appeal on Tuesday, but that was never done. She also referred attorney Firman to Assistant Solicitor Adam Rosenthal who typically handles the zoning issues for the legal department. She understood that they spoke about the matter amongst themselves and was copied on email traffic between them as well.

Attorney Firman did not appear or testify at the hearing or oral argument. However, he filed an "Affidavit of Efforts Made to Contact Defendants" on September 9, 2016. (Docket No. 4-1). In relevant part, the affidavit states that he discussed the "Stop Work Order / Cease Operations" notice by telephone with attorney Rosenthal on Wednesday, September 7, 2016. (*Id.* at ¶ 2). He then met personally with City Solicitor Lourdes Sanchez Ridge and Assistant Solicitor Michael Kennedy on Thursday, September 8, 2016 in an effort to resolve the matter but after it became apparent that it would not be resolved, informed them that he would be seeking a temporary restraining order and/or preliminary injunction on Friday, September 9, 2016. (*Id.* at ¶ 3). Plaintiff has not filed an appeal or application with the Zoning Board seeking to legalize the use of the property. Instead, Plaintiff filed its Complaint, Motion for Temporary Restraining Order and/or Preliminary Injunction and supporting Brief on Friday, September 9, 2016. A notice of service was filed at 1:30 p.m. indicating that these filings had been served on Defendants. (Docket No. 4). Given the City's stated opposition, the Court ordered the parties to file witness and exhibit lists and set the matter for a hearing on Monday, September 12, 2016 at 9:00 a.m.

Firman testified that he complied with the "Stop Work Order / Cease Operations" notice and did not open his business on Friday, September 9, 2016 or Saturday, September 10, 2016 as he had previously planned.[9] Aside from the testimony from Firman that he was behind on his rent,

---

[9] The Court notes that Firman's affidavit filed along with Plaintiff's Motion does not mention a possible reopening on Friday, September 9, 2016. (Docket No. 2-2). Rather, he states in the affidavit that he was seeking to

Plaintiff did not introduce any evidence to demonstrate that he had incurred expenses relative to the two dates when the business remained closed under the directives of PLI. Nor did Plaintiff provide the Court with any receipts or financial records associated with this operation. Firman briefly testified that he felt his business had suffered reputational damage as a result of the closure and that he had heard false rumors that there was a stabbing or shooting at Mother Fletcher's on that evening. Yet, he did not introduce any evidence corroborating the supposed rumors at the hearing.

III.   LEGAL STANDARD

The grant or denial of a temporary restraining order or a preliminary injunction is within the sound discretion of the Court. *See American Exp. Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). The primary purpose of preliminary injunctive relief "is maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir. 1994). "Status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The decision to issue a preliminary injunction and/or temporary restraining order is governed by the same four-factor test, wherein Plaintiff must demonstrate:

> "(1) that [it is] reasonably likely to prevail eventually in the litigation and (2) that [it is] likely to suffer irreparable injury without relief. If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiff[…] and (4) whether granting relief would serve the public interest."

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (quoting *Tenafly*

---

reopen the business on Saturday, September 10, 2016 and would sustain financial harm if he was unable to do so.   (*Id.* at ¶¶ 47, 48).

*Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)); *see also Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 589 (W.D. Pa. 2009) ("The standard used to evaluate whether the issuance of a temporary restraining order is warranted is the same as that used to evaluate whether the issuance of a preliminary injunction is appropriate."). In reaching its decision on the request for injunctive relief, the Court sits as both the arbiter of legal disputes and trier of fact and is therefore tasked with resolving factual disputes and assessing the credibility of witness testimony. *See e.g., Hudson Global Resources Holdings, Inc. v. Hill*, Civ. A. No. 07-132, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007) ("A court considering whether to grant a preliminary injunction may assess the credibility of witnesses testifying before it at a preliminary injunction hearing, and base its decisions on credibility determinations.").

IV.    DISCUSSION

Plaintiff seeks a restraining order and/or preliminary injunction to lift the "Stop Work Order / Cease Operations" Order that was issued by the City and PLI on September 3, 2016 arguing that it has presented sufficient evidence to demonstrate that it will likely succeed on the merits of its procedural and substantive due process claims. (Docket Nos. 2, 3, 19). Plaintiff claims that the Order was defective and issued improvidently under circumstances that did not constitute an emergency, as is allegedly required under the Zoning Code. (*Id.*). Throughout the hearing and argument, Plaintiff's counsel repeatedly emphasized that such relief is sought so that Mother Fletcher's can reopen and operate its business in the manner that it did on September 3, 2016 while it litigates before the Zoning Board of Adjustment whether its use is consistent with the zoning of 2200 East Carson Street. In opposition, Defendants maintain that the due process claims are not yet ripe for adjudication because Plaintiff failed to invoke the procedures available to it to challenge the decision under the Zoning Code and they alternatively contend that the claims

are not likely to succeed on the merits as the Order was appropriately issued due to Mother Fletcher's operating an illegal nightclub outside the scope of the permitted use of the property. (Docket No. 20). Having carefully considered the parties' arguments and studied the relevant legal precedent, the Court finds that Plaintiff is not likely to succeed on the merits of its claims and will deny the requested temporary restraining order and preliminary injunction. The Court will also *sua sponte* dismiss the claims, without prejudice, under the doctrine of ripeness and Third Circuit precedent applying same to § 1983 actions involving these types of land use disputes.

As noted, Plaintiff's federal constitutional claims are brought pursuant to 42 U.S.C. § 1983, which provides that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. This statutory provision "does not create substantive rights," but instead "provides a remedy for the violation of rights conferred by the Constitution or other statutes." *Maher v. Gagne*, 448 U.S. 122, 129, n. 11, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). In order to establish a claim under the statute, a plaintiff "'must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law.'" *Kneipp by Cusack v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)). Thus, a plaintiff cannot prevail without establishing an underlying violation of a federal constitutional or statutory right. *Collins v. City of Harker Heights*, 503 U.S. 115, 119, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (remarking that § 1983 "does not provide a remedy for abuses that do not violate

federal law"). "Section 1983 'itself contains no state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right." *Bd. of Cty. Comm's v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (quoting *Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). The remedies available under section 1983 include prospective relief such as an injunction prohibiting future violations of federal law and a declaration that such state action violates federal law. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. Const., Amend. XIV, § 1. This constitutional provision provides individuals with "both substantive and procedural rights." *Albright v. Oliver*, 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion). "[B]y barring certain government actions regardless of the fairness of the procedures used to implement them," the Due Process Clause "serves to prevent governmental power from being used for purposes of oppression." *Daniels*, 474 U.S. at 331, 106 S.Ct. 662 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 277, 18 How. 272, 277, 15 L.Ed. 372 (1856)). "By requiring the government to follow appropriate procedures when its agents decide to deprive any person of life, liberty, or property, the Due Process Clause promotes fairness in such decisions." *Daniels*, 474 U.S. at 331, 106 S.Ct. 662. The "substantive" and "procedural" requirements of the Due Process Clause are attributable to these distinct legal principles. *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

Overall, the Court agrees with Defendants that Plaintiff's claims are not yet ripe for adjudication under applicable Third Circuit precedent analyzing § 1983 claims challenging land use and zoning decisions by local municipalities. *See e.g., Taylor Inv., Ltd. v. Upper Darby Twp.*,

983 F.2d 1285, 1291 (3d Cir. 1993); *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 423 (3d Cir. 2008). In this regard, the Court of Appeals has succinctly held that:

> Constitutional challenges to land-use decisions under 42 U.S.C. § 1983 may not proceed unless the local authority has been given the opportunity to render a final decision regarding the challenged zoning ordinance. *See Taylor Inv., Ltd. v. Upper Darby Twp.*, 983 F.2d 1285, 1290–91 (3d Cir.1993). A property-owner "has a high burden of proving that a final decision has been reached by the agency before it may seek compensatory or injunctive relief in federal court on federal constitutional grounds." *Acierno v. Mitchell*, 6 F.3d 970, 975 (3d Cir. 1993) (internal citation omitted).

*Harris v. Twp. of O'Hara*, 282 F. App'x 172, 175–76 (3d Cir. 2008). The application of the finality rule results in dismissal of the unripe claim, without prejudice. *Id.* Here, Plaintiff has not met its high burden to avoid the finality rule because it initiated a federal lawsuit challenging a land-use decision by PLI a mere five days after it was rendered, without even attempting to invoke any formal procedures that are available under the City's Zoning Code. In the City of Pittsburgh, the Zoning Board of Adjustment is the "primary controlling authority" tasked with hearing appeals, interpreting zoning ordinances and special exemptions and evaluating the uses that are authorized on the property. *Broussard v. Zoning Board of Adjustment of City of Pittsburgh*, 589 Pa. 71, 81, 907 A.2d 494, 500 (Pa. 2006). The decision challenged in this case has not been presented to the Zoning Board for a final ruling, as is required. In light of the above authority and the factual circumstances surrounding this matter, it is apparent that Plaintiff's due process claims are premature and not likely to succeed on the merits.

Plaintiff seeks to avoid application of such well-established legal principles in a number of ways, but none of its arguments are persuasive. Plaintiff initially claims that the form of the "Stop Work Order / Cease Operations" Order is insufficient to provide it with appeal rights under the Zoning Code, chastising Defendants for not issuing a more formal notice of violation, a citation, or

a complaint for injunctive relief. Yet, "Pennsylvania courts have made clear that even an informal and unwritten interpretation by zoning officers may constitute an appealable 'determination.'" *Harris,* 282 F. App'x at 176 (citing *N. Codorus Twp. v. N. Codorus Twp. Zoning Hearing Bd.*, 873 A.2d 845, 846–47 (Pa. Commw. 2005); *Collis v. Zoning Hearing Bd.*, 415 A.2d 102, 103–04 (Pa. Commw. 1980)). Plaintiff's position also elevates form over substance as the evidence demonstrates that any information that was not self-evident on the face of the Order was actually communicated to Firman by Mariani at the time of the shutdown as he explained that Mother Fletcher's was not operating as a restaurant, which is the permitted use. And, Director Kennedy reiterated the reasons for the closure to Plaintiff's representatives less than 48 hours later and also explained the corrective actions needed to reopen the business.

Plaintiff next complains that the Order was issued without strict adherence to §§ 924.05.A. and B of the Zoning Code because there was no "emergency" situation at Mother Flecther's at the time it was shutdown. However, the Third Circuit has held that the mere fact that local authorities strayed from established procedures does not produce a "mature constitutional injury" that is actionable without first obtaining a final decision from the local adjudicative body. *Taylor Inv.*, 983 F.2d at 1294. In any event, Plaintiff ignores that the City's Zoning Code explicitly authorizes the City to issue a stop work order if there is a violation of a permit, among other things. *See Zoning Code* at § 924.04.C. ("With or without revoking permits, the City may stop work on any Development, Regulated Activity, building or structure on any land on which there is an uncorrected violation of a provision of this Code … or of a permit or approval or other form of authorization issued hereunder."). Additionally, the Zoning Code does not limit the City's enforcement powers to those two particular provisions (i.e., §§ 924.05.A. and B) as it also provides that "the City may exercise any and all enforcement powers granted to [it] by Pennsylvania law, as

20

it may be amended from time to time." *See Zoning Code* at § 924.06.A. Finally, as the Court commented at the hearing, the emergency provision of § 924.05.B. grants <u>broad discretion</u> to Director Kennedy to determine when an emergency is present and she decided, in her discretion, that the operation of an illegal under-21 nightclub at a South Side property zoned as a restaurant—with a condition of no live entertainment—required immediate action.

More relevant for present purposes however, is that "Pennsylvania case law [ … ] provides a judicial mechanism to challenge a stop work order," *Kapish v. Advanced Code Grp.*, No. 3:15CV278, 2015 WL 5124143, at *6 (M.D. Pa. Sept. 1, 2015) (citing cases), but Plaintiff has not yet availed itself of those procedures.[10] In this regard, Director Kennedy testified that the "Stop Work Order / Cease Operations" Order is appealable to the Zoning Board of Adjustment, and even advised one of Plaintiff's attorneys where to locate the appeal form on the website. A review of the relevant provisions governing appeals in the Zoning Code confirms her testimony as the broad language contained therein plainly demonstrates that this particular action is appealable:

> **Appeals to the Board may be taken by any person aggrieved**, or the head of any department affected **by a decision of the city official from whose action the appeal is taken**. Each appeal shall be taken within thirty (30) days of the determination, action, or decision. The filing of appeals, hearings notices and hearings, whether for interpretations, variances or validity determinations, shall be in accordance with this Code's provisions for variance appeals in Sec. 922.09.

*Zoning Code* at § 923.02.D (emphasis added). Likewise, the Board is granted the power to:

> **hear and decide appeals where it is alleged that there is error in any order, requirement, decision or determination made by the**

---

[10] The Court notes that Plaintiff has lodged unsupported complaints about potential delays awaiting a decision by the Zoning Board on any appeal. However, the caselaw is legion that a party cannot avoid the finality rule without making a concrete showing that the available post-deprivation procedures are "'patently inadequate.'" *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 423 (3d Cir. 2008) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116(3d Cir. 2000)).

> **Zoning Administrator or the Chief of the Bureau of Building Inspection in the administration of this Code**, and, upon appeal, to interpret any provision of this Code where its meaning or application is in question.

*Zoning Code* at § 923.02.B (emphasis added). PLI Assistant Director Mariani issued the Order directing Mother Fletcher's to stop work and cease operations at the behest of Director Kennedy and with her authorization. This type of order is within the scope of the broad language of §§ 923.02.B and D, making it an appealable decision. As the Court of Appeals has explained, the final decision as to the propriety of the issuance of the "Stop Work Order / Cease Operations" Order is for the Board to make and not the PLI. *See E & R Enter. LLC v. City of Rehoboth Beach, Delaware*, No. 15-3117, 2016 WL 3077612, at *3 (3d Cir. June 1, 2016) ("E&R's failure to appeal to the BOA is dispositive for ripeness purposes because the BOA alone had the authority to render a final decision as to whether E & R was properly denied a building permit pursuant to the City's zoning regulations."). Moreover, the time for Plaintiff to file the appeal within 30 days of the decision has not yet expired.

In its supplemental brief, Plaintiff purports to raise a constitutional challenge to § 924.05.B of the Zoning Code claiming that such provision is allegedly void for vagueness because it grants unfettered discretion to the Director of PLI to determine when an emergency warranting a stop work order exits.[11] (Docket No. 19). However, this type of constitutional challenge does not suffice to supplant the finality rule discussed above. As the Court of Appeals held earlier this year:

---

[11] This argument is also procedurally defective because no such claim is made in Plaintiff's Complaint, initial Motion or supporting Brief and it is improper for a party to utilize the post-hearing supplemental brief to raise an entirely new claim. *See e.g., Vay v. Huston*, No. CV 14-769, 2016 WL 1408116, at *8 (W.D. Pa. Apr. 11, 2016) ("Although this Court often holds oral argument and liberally permits supplemental briefing, these procedures should not be construed as the Court granting permission to raise for the first time new issues or arguments at the hearing and through supplemental submissions.").

> [t]he finality rule bars premature, as-applied procedural due process claims, *Taylor*, 983 F.2d at 1293 (citing *Williamson Cty.*, 473 U.S. at 200, 105 S.Ct. 3108), as well as "as-applied substantive due process and equal protection claims by property owners or tenants who have challenged the denial of a permit by an initial decision-maker but failed to take advantage of available, subsequent procedures," *County Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006) (quoting *Lauderbaugh*, 319 F.3d at 574).

*E & R Enter. LLC*, 2016 WL 3077612, at *2. Pennsylvania law also supports this Court's opinion that the purported constitutional vagueness challenge cannot be heard by this federal court without a decision by the Zoning Board. To this end, the Supreme Court of Pennsylvania has explained that:

> zoning ordinances should receive a reasonable and fair construction in light of the subject matter dealt with and the manifest intention of the local legislative body, *see Appeal of Perrin*, 305 Pa. 42, 55, 156 A. 305, 308-09 (1931); moreover, courts ordinarily grant deference to the zoning board's understanding of its own ordinance because, as a general matter, governmental agencies are entitled "great weight" in their interpretation of legislation they are charged to enforce. *Federal Deposit Ins. Corp. v. Board of Finance and Revenue*, 368 Pa. 463, 471, 84 A.2d 495, 499 (1951) (citing, *inter alia*, *Logan v. Davis*, 233 U.S. 613, 627, 34 S.Ct. 685, 690, 58 L.Ed. 1121 (1914)); *see Willits Woods Assocs. v. Zoning Bd. of Adjustment of City of Phila.*, 138 Pa.Cmwlth. 62, 67, 587 A.2d 827, 829 (1991); *Appeal of Longo*, 183 Pa.Super. 504, 508, 132 A.2d 899, 901 (1957); *cf.* 1 Pa.C.S. § 1921(c)(8). Notably, this principle applies where the precise meaning of the contested provisions is uncertain, and not where they are clear and explicit in their language. *See Federal Deposit Ins. Corp.*, 368 Pa. at 472, 84 A.2d at 499; 1 Pa.C.S. § 1921(c).

*Broussard*, 589 Pa. at 81, 907 A.2d at 500. Simply put, it is up to the Zoning Board in the first instance to: interpret the undefined term "emergency" set forth in § 924.05.B; decide whether the facts at issue in this case constituted an "emergency"; determine if some other provision of the Zoning Code or Pennsylvania law otherwise authorized the City's action; and, make the ultimate decision as to whether the issuance of the Order was appropriate or not.

Beyond the failure to appeal the Order, it is also this Court's opinion that the due process claims are not yet ripe because Plaintiff never filed for a special exemption, variance or conditional use permit with the Zoning Board seeking to alter the use of the property to permit dancing as would be required if the property is properly designated as either a "restaurant (limited)" or "restaurant (general)" under the Code. *See e.g., Williamson*, 473 U.S. at 199-200 (Supreme Court refused to consider merits of claims as plaintiff did not file for a variance before bringing the federal lawsuit). Even if the Court assumes that Mother Fletcher's "soft drink bar" and "chip buffet" constitutes a "restaurant" under the Code, which this Court expressly declines to so hold given the paucity of evidence supporting that position,[12] Plaintiff would need approval of the Zoning Board to change the use of the property in order to permit dancing at that location.

The present authorized use at 2200 East Carson Street via the 1984 special exemption is to operate a first floor restaurant with a condition of no live entertainment. (Def. Ex. B). The City takes the position that the floor area of the property is less than 2,400 square feet such that it must be zoned as a "restaurant (limited)" under the Code, which expressly precludes dancing as a use, such that those activities cannot be undertaken without approval by the Zoning Board and the issuance of a special exemption, variance or conditional use permit. *See Zoning Code* at § 911.02. Plaintiff counters that the floor area is greater than 2,400 square feet and that the property should be zoned as a "restaurant (general)" which authorizes both dancing and live entertainment as permissible uses. *Id.* However, Plaintiff overlooks the fact that a special exemption is required to operate a "restaurant (general)" in the South Side, as it is a local neighborhood commercial district. *Id.* In fact, Layman offered uncontested testimony on this point. Therefore, accepting

---

[12]    Despite some suggestions by Plaintiff's counsel, the record is devoid of evidence that Mother Fletcher's had any intent to operate a traditional restaurant at 2200 East Carson Street as opposed to an Under-21 dance club.

either party's argument on this legal dispute results in the same inevitable conclusion that Plaintiff needs approval of the Zoning Board prior to operating Mother Fletcher's in the manner that it advertised and how it was operated for three and a half hours on September 3 and 4, 2016. (*See* Def. Exs. C-F). Since Plaintiff has not yet filed an application seeking to legalize dancing at the location, its due process claims are not suited for judicial review in this Court.

For all of these reasons, the Court holds that Plaintiff's due process claims are not yet ripe for adjudication in this federal forum and thus, are necessarily not likely to succeed on the merits. In light of this holding, the Court need not delve too deeply into the remaining factors requiring: a showing of irreparable harm; balancing the relative interests of the parties; and evaluating the public's interest in the issuance of the requested injunctive relief. *See K.A. ex rel. Ayers*, 710 F.3d at 105. It is enough to say that the primary purpose of such relief, i.e., to maintain the status quo between the parties "until a decision on the merits of a case is rendered," *Acierno*, 40 F.3d at 647, would be undermined by granting same in this instance. Indeed, binding Third Circuit precedent demands that the merits of this federal case cannot be determined without a ruling by the Zoning Board and any further appeals therefrom are heard and ruled upon by the appropriate tribunal. The Court of Appeals has likewise made clear that the filing of § 1983 actions challenging land use decisions cannot be utilized to convert "federal courts into super zoning tribunals," *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 285 (3d Cir. 2004), such that this Court lacks the present authority to issue an injunction altering the authorized use of the property. It is also apparent from the record that the status quo between the parties is that the first floor of 2200 East Carson Street is currently bound by the use authorization provided in the 1984 special exemption, whereby a restaurant with no live entertainment may be operated on site. (Def. Ex. B). Those are presently the limitations that the City has enforced with its issuance and posting of the Order. Once again,

that Order is not final as it is subject to appeal to the Zoning Board.

In light of the foregoing, the Court denies Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction because its § 1983 due process claims are not ripe. The Court of Appeals has also instructed that § 1983 claims that do not meet the requirements of the finality rule are non-justiciable and must be dismissed, without prejudice. *Taylor Inv.*, 983 F.2d at 1290 ("Because ripeness affects justiciability, we believe that unripe claims should ordinarily be disposed of on a motion to dismiss, not summary judgment").[13] Accordingly, this Court's finding that the claims are not ripe for adjudication on this record must also result in dismissal of Plaintiff's due process claims, without prejudice. *Id.*

V.      CONCLUSION

In conclusion, this Court holds that Plaintiff's § 1983 due process claims are not mature enough for this Court to entertain because the "Stop Work Order / Cease Operations" Order has not been appealed to the Zoning Board and Plaintiff has otherwise taken no steps to seek approval from the Zoning Board to use the property in the manner in which Mother Fletcher's advertised and operated, albeit for only 3 and a half hours on September 3 and 4, 2016. It is not up to this Court to decide whether to accept Plaintiff's argument that the City should leave kids alone to dance the night away at Mother Fletcher's or to credit the City's fears that authorizing this business will turn the South Side Flats into a teenage wasteland causing a drain on its otherwise scarce public resources to protect the under-21 crowd in that environment. Rather, Plaintiff must take its fight for the rights of local youth to party at Mother Fletcher's to the Zoning Board.

---

[13]      The Court of Appeals has likewise held that "the district court is not limited to the face of the pleadings in deciding" whether claims are ripe for adjudication. *Taylor Inv.*, 983 F.2d at 1290, n.7. Hence, the Court has considered the record developed during the hearing of this matter in reaching the conclusion that the claims must be dismissed.

Accordingly, Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [2] is DENIED and the Court will *sua sponte* dismiss Plaintiff's § 1983 due process claims, without prejudice.   An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: Constitution Day, September 16, 2016

cc/ecf: All counsel of record.